FILED

2015 Oct-28  PM 03:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
ARTHUR C. THOMAS,             }
                              }
      Plaintiff,              }
                              }        CIVIL ACTION NO.
v.                            }        2:14-CV-0844-WMA
                              }
KAMTEK, INC.,                 }
                              }
      Defendant.              }
```

**MEMORANDUM OPINION**

On May 12, 2015, the court ordered plaintiff Arthur C. Thomas, in light of its recent opinion in *Savage v. Secure First Credit Union*, ---- F.Supp.3d ----, 2015 WL 2169135 (N.D. Ala. May 8, 2015), to show cause "why the court should not require him either to dismiss all his claims except that in Count One [race discrimination], or to pursue only one of the claims contained in Counts Two [age discrimination], Three [disability discrimination], and Four [retaliation], as the 'but-for' cause and dismiss all other claims." (Doc. 16). After granting Thomas an extension (Doc. 17 and Doc. 19), he filed his response on June 9, 2015 (Doc. 19). Rather than amend his complaint, Thomas took the position that he was not required to elect only one theory under "but for" causation and that "[p]laintiff can legally prevail on each-or all-of her [sic] claims." (Doc. 19 at 5).

With discovery almost complete and the dispositive motions deadline nearing on August 3, 2015, the court entered an order

1

extending the deadline for any response by defendant Kamtek Inc. ("Kamtek") to run concurrently with the dispositive motions deadline. (Doc. 20).  On August 3, 2015, Kamtek filed a motion for summary judgment on all four of Thomas' claims. (Doc. 21).  Thomas filed his response to Kamtek's motion on September 8, 2015 (Doc. 26), and Kamtek filed a reply on September 21, 2015 (Doc. 28). Kamtek's motion is now under submission.

For the reasons stated below, Kamtek's motion for summary judgment will be denied as to Count I and granted as to all other counts.

"[C]onsidering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party . . . [s]ummary judgment is appropriate where the evidence shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005) (quoting Fed. R. Civ. Proc. 56(c)) (citation omitted). "For factual issues to be considered genuine, they must have a real basis in the record . . . mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Id*. at 1326 (citations omitted).

### Count I

"Where, as here, there is no direct evidence of discrimination, a plaintiff may prove discrimination through

circumstantial evidence, using the burden-shifting framework established in *McDonnell Douglas*." *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008).

## A. Prima facie case

"Under the *McDonnell Douglas* framework, [a plaintiff] must first make a prima facie case, which generally requires a showing that: 1) he belongs to a protected class; 2) he was qualified to do the job; 3) he was subjected to adverse employment action; and 4) and his employer treated similarly-situated employees outside his class more favorably." *Humphrey v. Napolitano*, 517 F. App'x 705, 708 (11th Cir. 2013) (citing *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.2008)).  It is undisputed that (1) Thomas is black and therefore in a protected class (Doc. 1 at 2; Doc. 7 at 2) and (2) was reasonably qualified for his position (Doc. 21 at 3; Doc. 26 at 3).  However, Kamtek says that Thomas fails to meet the third and fourth prongs of a *prima facie* case (Doc. 21 at 21-24).

### i.   Adverse action

"[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material change* in the terms, conditions, or privileges of employment . . . [m]oreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town*

*of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).

While Kamtek argues at length that selection for a workplace drug test is not an adverse action,[1] it overlooks the reality that Thomas was **terminated** as a result of the drug test episode. "Termination is an adverse employment action." *McCray v. Wal-Mart Stores, Inc.*, 377 F. App'x 921, 923 (11th Cir. 2010). Therefore, Thomas satisfies the third prong of a *prima facie* case for racial discrimination.

### ii. Similarly situated individuals

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners . . . [i]n other words, apples should be compared to apples." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quotes omitted)). "The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies." *Lathem*

---

[1] Nowhere in Thomas' complaint (Doc. 1), deposition (Doc. 22-2), or briefing (Doc. 27) does he assert that his selection for a drug test was an adverse action. In fact, when asked in his deposition if "what [he] wanted . . . was [for Kamtek] to let [him] not have to take the test that morning", Thomas responded "I never said that . . . I just wanted to be treated fair . . . I took the test." (Doc. 22-2 at 31).

*v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999).

Thomas provides William Phillips, Charles McBride, and Robin Embry as similarly situated white Kamtek employees who were treated differently than he in respect to their drug tests. (Doc. 26 at 9-12).  While it is undisputed by the parties that Phillips received more than two hours to produce urine during his drug test (Doc. 21 at 28-29; Doc. 26 at 9-10), Phillips is not a fair congener because Kamtek offers undisputed testimony that Phillips was a different situation under Kamtek policy being tested following treatment after he came forward and requested treatment for a drug problem. (Doc. 22-1 at 7; Doc. 27-2 at 6, 55).

Yet, while Phillips is dissimilar, McBride and Embry were both drug tested under the same two hour policy as Thomas (Doc. 28 at 11-12; Doc. 26 at 10-11), and the parties offer conflicting testimony on whether that two hour time limit was applied preferentially. First, Shannon Hendon, an employee of PSI, the temporary staffing company providing drug screening services for Kamtek, administered the drug test to McBride and testified that when McBride "still couldn't provide enough urine [][a]fter about an hour," he phoned Kamtek HR manager Charman Meador who then told Hendon to give McBride three hours. (Doc. 22-4 at 9-10).  While Hendon testified "I don't know the exact amount of time [it took McBride to provide his urine sample]", she also testified that after the phone call with Meador, McBride did **not** produce the

sample "pretty quickly" but instead he had to drink more water and they both "had to sit in the cafeteria for a while." (Doc. 22-4 at 10). In fact, Kamtek admits that "Meador agreed that additional time could be given if necessary." (Doc. 21 at 15). Arguing in the alternative, Kamtek tries to distinguish McBride on the basis that he asked for more time during his drug test whereas Thomas did not. (Doc. 21 at 30). Aside from the disputed fact that Thomas did implicitly request more time when being escorted off the Kamtek premises (Doc. 22-2 at 31-32), Kamtek's distinction is irrelevant given the undisputed testimony that Kamtek's two-hour policy was inflexible

(Doc. 21 at 7, 11, Doc. 22-1 at 5; Doc. 22-2 at 18, 25; Doc. 22-4 at 6-7; Doc. 27-1 at 54-59; Doc. 27-3 at 32, 82-85). Next, Nancy Crowder-Deed, an employee of PSI who administered the drug test to Embry, testified that when Embry got upset in the course of the drug test, HR manager Meador got involved, reprimanded Crowder-Deed for not having the "right attitude," and then Embry was allowed "two and a half hours" to produce her urine sample. (Doc. 27-3 at 83-84).

Therefore, when viewed in the light most favorable to Thomas, there is more than enough evidence for a prima facie case that during his drug test Thomas was not treated similarly to McBride and Embry.

### B.   Pretext

"When a plaintiff has established a prima facie case of

discrimination, the burden of production then shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action . . . [and] [i]f the defendant is able to do so, the burden shifts back to the plaintiff to show that this reason is really a pretext for unlawful discrimination" *Winborn v. Supreme Beverage Co. Inc.*, 572 F. App'x 672, 674-75 (11th Cir. 2014) (citing *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002)).  To show pretext, the plaintiff must "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Floyd v. Fed. Exp. Corp.*, 423 F. App'x 924, 931 (11th Cir. 2011).  Specifically, "in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff . . . must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).

While Kamtek offers Thomas' work-rule violation of failing to produce a urine sample during his drug test as its legitimate, nondiscriminatory reason for terminating him (Doc 21 at 6-9, 31-

33), the record contains sufficient evidence to create a genuine issue of material fact as to whether Kamtek's reason is pretextual.

### A.   No work rule violation

The "defense that [an] employee was fired for violation of work rules is arguably pretextual when a plaintiff submits evidence that [he] did not violate the cited work rule." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (quotes omitted).

Neither party disputes that as an employee of Kamtek, Thomas was subject to Kamtek's written Drug/Alcohol Testing Policy, which states in part:

> 3. An employee who test [sic] positive for drugs or alcohol will be subject to discipline up to and including discharge.
> 4. An employee who fails to appear for a drug test, or **provide a sample for such test,** will be considered to have incurred a positive test result and will be subject to disciplinary action.

(Doc. 22-2 at 93) (emphasis added).   It was also Kamtek's policy to allow an employee two hours to provide a urine sample,[2] whereby failure to provide a sample in the time limit was viewed as a

---

[2] The record only contains a summary of Kamtek's written Drug/Alcohol Testing Policy, which states "[a] complete copy of the Drug and Alcohol Testing Policy may be obtained in the Human Resources Office." (Doc. 22-2 at 93).  While the complete policy is absent from the record and the written summary is silent on the amount of time an employee is given for testing, both parties agree that it was Kamtek's policy to give employees two hours to produce a urine sample. (Doc. 21 at 8; Doc. 26 at 5).  Kamtek's HR manager, Charman Meador, stated in her declaration that "it was Kamtek's policy to allow employees two hours to produce a sample." (Doc. 22-1 at 5).  In his deposition, Thomas similarly acknowledged it was Kamtek's policy to give employees a two hour time limit to produce the urine sample. (Doc. 22-2 at 18).

refusal to comply or refusal to provide a sample. (Doc. 21 at 8).

Despite Kamtek's assertion that Thomas was given the full two hours (Doc. 21 at 24-25), the record contains conflicting testimony and a genuine issue of material fact as to whether Thomas received the full two hours. First, Thomas testified that contrary to Kamtek policy, he was given "nowhere near two hours." (Doc. 22-2 at 18, 41).[3]  Next, Crowder-Deed, who was present during Thomas' drug test, testified that Thomas' drug screening began at "6:35 approximately" (Doc. 27-3 at 44-45) but that Thomas was escorted off the Kamtek property "before 8:30" (Doc. 27-3 at 60).  Crowder-

---

[3] Kamtek's focuses on certain "inconsistencies" in Thomas' statements (Doc. 21 at 3, 23, 27), however these "inconsistencies" are not blatant contradictions and at most relate to Thomas' credibility, which is assessed by the fact-finder and not on summary judgment. Cf. *White v. Georgia*, 380 Fed. Appx. 796, 798 (11th Cir. 2010) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").  While Thomas did testify that he is "not sure" how much time he got (Doc. 22-2 at 39), when he was asked "[y]ou did get the two hours though, didn't you?", Thomas replied "No, sir." (Doc. 22-2 at 39).  When asked again later in his deposition "you really had about two hours to take the test; right?", Thomas again replied "No, I didn't." (Doc. 22-2 at 41).  Additionally, in Thomas' EEOC charge he stated that he was discharged from Kamtek because he "could not produce enough urine sample for a random drug test during a 45 minute period." (Doc. 1-1 at 3; Doc. 22-2 at 98, 187).  When asked about the "45 minute period" during his deposition, Thomas acknowledged that "[i]t could be [inaccurate] . . . [i]t could be right," but that even though he was not able to say how long he did have "[i]t was -- it was -- it might have been right around 45 minutes, but it was nowhere near two hours."(Doc. 22-2 at 41).  Further, Crowder-Deed testified that she and Thomas were in the bathroom and locker room area for testing "[a]pproximately . . . thirty, thirty-five minutes." (Doc. 27-3 at 58).

Deed further stated that she recalled Thomas stating "he needed two hours, and he's not been given the two hours to produce the urine . . . [a]nd that white employees get two hours, and black employees do not get two hours." (Doc. 27-3 at 55-56). Finally, Hendon, not physically present during Thomas' drug screening, testified that she received a phone call from Thomas the morning of the drug screen where he told her that "[h]e wasn't allotted enough time [,two hours,] to give a urine sample." (Doc. 22-4 at 6-7). Hendon further testified that she was not aware of any employee given less than two hours "other than Arthur Thomas." (Doc. 22-4 at 11). Therefore, when viewed in the light most favorable to Thomas, this testimony creates a genuine issue of material fact as to whether Thomas was given the required two hours and therefore whether he violated Kamtek's drug policy.

**B. Comparators and deviation from policy**

"A typical means of establishing pretext is through comparator evidence." *Walker v. St. Joseph's/Candler Health Sys.*, Inc., 506 F. App'x 886, 889 (11th Cir. 2013). "Especially relevant to such a showing [of pretext] would be evidence that white employees involved in acts against petitioner of comparable seriousness . . . were nevertheless retained or rehired." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973); see *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1277 (11th Cir. 2008) ("[w]e, too, address the sufficiency of any comparator evidence in our examination of

pretext, rather than as an element of [plaintiff's] prima facie case . . .") "The bending of established rules may, of course, be suggestive of discrimination." *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002) (citation omitted); see *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) ("[d]epartures from normal procedures may be suggestive of discrimination").

Consistent with Thomas' *prima facie* case, and viewing the testimony of Thomas, Hendon, and Crowder-Deed in the light most favorable to Thomas, comparators McBride and Embry were given the full two hours or even longer to produce a urine sample whereas Thomas was not even given the full two hours. *See infra*.

Furthermore, while according to Kamtek HR manager Meador "it was Kamtek's policy to allow employees two hours to produce a sample" (Doc. 22-1 at 5), there is conflicting testimony that Kamtek bent the rules for McBride and Embry while inflexibly applying it to Thomas. First, Hendon testified that when she administered the drug test to McBride, Kamtek's HR manager Meador told her that she "needed to go by the DOT guidelines with the drug screening [which were] . . . three hours." (Doc 22-4 at 9). When Hendon called Crowder-Deed "about Department of Transportation regulations per Charman's request . . . [Crowder-Deed] informed her that we don't follow DOT regulations . . . [w]e follow the two-hour rule." (Doc. 27-3 at 78-80). Hendon was **not** asking Crowder-Deed

11

whether it was two hours or three, but rather the oddity of "why would Charman ask her to refer to Department of Transportation three-hour rule as it relates to this Kamtek employee . . . why is Charman referring to Department of Transportation urine collection rules, regs, and policies?" (Doc. 27-3 at 79-80).  After verifying that McBride was given three hours as documented in the "[s]hift exchange e-mail," Crowder-Deed testified that she asked Mike Echols, a PSI employee she reported to, to "verify with [Meador] that the policy is two hours and not DOT regulations . . . for three hours." (Doc. 27-3 at 82-83).  Crowder-Deed testified that subsequently Echols informed PSI employees in one of their meetings "that we do not adhere to DOT regulations, and I don't know what [Meador] is talking about." (Doc. 27-3 at 82-83).  Next, Crowder-Deed testified that when administering Embry's drug test, Embry became upset, Meador became involved and reprimanded Crowder-Deed, and then Embry was given "[t]wo and a half hours." (Doc. 27-3 at 84).  After this situation, Crowder-Deed emailed Echols "[a]bout the fact that we're not following the DOT or three-hour accommodation as it relates to our drug policy," to which Echols responded, "[t]wo hours is our policy." (Doc. 27-3 at 84-85).  Therefore, taking these statements as true for purposes of summary judgment, the dissimilar treatment and the bending of the rules for McBride and Embry suggests pretext by Kamtek.

    Because there is more than enough evidence to establish a *prima facie case* and to create a genuine issue of material fact as

to whether Kamtek's legitimate, non-discriminatory reason is pretextual, summary judgment on Count I in favor of Kamtek is inappropriate .

### Counts II, III, and IV

On May 12, 2015, the court ordered Thomas, in light of its recent opinion in *Savage v. Secure First Credit Union*, ---- F.Supp.3d ----, 2015 WL 2169135 (N.D. Ala. May 8, 2015), to show cause why it ought not dismiss his multiple simultaneous "but-for" claims. (Doc. 16). Rather than amend his complaint, Thomas took the position that he was not required to elect only one theory under "but for" causation and that "[p]laintiff can legally prevail on each-or all-of her [sic] claims." (Doc. 19 at 5).

Thomas does not respond to Kamtek's motion as to Counts II, III, and IV, and he effectively concedes that these counts are not viable by narrowly praying that Kamtek's motion for summary judgment only be "denied with regard to his race case." (Doc. 26 at 19). Where a party fails "to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it." Fed. R. Civ. Proc. 56.

Despite Thomas' allegation in Count II of discrimination on the basis age, Thomas admitted in his deposition that he had no basis for his ADEA claim. (Doc. 22-2 at 37). Furthermore, since Thomas alleges he was terminated based on his race in violation of

13

Title VII (Doc. 1 at 5-6; Doc 22-2 at 34-35; Doc. 26), age cannot be the "but-for" cause of his termination. See *Hendon v. Kamtek, Inc.*, 2015 WL 4507990 (N.D. Ala. July 24, 2015) (Title VII and ADEA). Therefore Kamtek is entitled to summary judgment on Count II.

Despite Thomas' allegation in Count III of discrimination on the basis of a disability, Thomas admitted in his deposition that he had no basis for his ADA claim. (Doc. 22-2 at 37). Furthermore, since Thomas alleges he was terminated based on race in violation of Title VII (Doc. 1 at 5-6; Doc 22-2 at 34-35; Doc. 26), a disability cannot be the "but-for" cause of his termination. See *Savage*, 2015 WL 2169135 (retaliation, ADEA, and ADA). Therefore Kamtek is entitled to summary judgment on Count III.

Finally, despite Thomas' allegation in Count IV that Kamtek retaliated against him in violation of Title VII for reporting discrimination, Thomas admitted in his deposition that he had no basis for his retaliation claim. (Doc. 22-2 at 37). Furthermore, since Thomas alleges he was terminated based on race in violation of Title VII (Doc. 1 at 5-6; Doc 22-2 at 34-35; Doc. 26), retaliation cannot be the "but-for" cause of his termination. See *Donald v. UAB Hosp. Mgmt., LLC*, 2015 WL 3952307 (N.D. Ala. June 29, 2015) (quote omitted). Therefore, Kamtek is entitled to summary judgment on Count IV.

In contrast to Thomas' response to the court's May 12, 2015

14

show cause order, his pleading **was** deficient as to "all claims except that in Count One." (Doc. 16). The disposition of this case on a Rule 56 motion for summary judgment rather than a Rule 12(b)(6) motion to dismiss illustrates the importance of **requiring plaintiffs to elect between multiple "but-for" employment discrimination claims at the motion to dismiss stage of litigation**. See e.g. *Culver v. Birmingham Bd. of Educ.*, 646 F.Supp.2d 1270 (N.D. Ala. 2009).

The necessity of resolving multiple "but-for" claims at the motion to dismiss stage is rooted in the pleading standard of Rule 8(a) itself, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). In the bygone era of the "no set of facts" approach in *Conley v. Gibson*, 355 U.S. 41, 45 (1957), "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). Yet, since *Twombly* and *Iqbal*, a complaint must contain more; it must contain sufficient factual matter, accepted as true, to "state a claim to relief that is **plausible on its face**." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. V. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). Pleading facts "'merely consistent with' a defendant's liability . . . stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

(quoting *Twombly* at 557).

When pleading "but-for" causation consistent with *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) and *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), multiple "but-for" claims may be **conceivable** but they are **not plausible** on their face. *Twombly*, 550 U.S. at 570 ("[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed"). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. Quite plainly, under Rule 8(a) a claim for employment discrimination requires pleading facts that provide plausible "proof that the [employer's discrimination] was **the** but-for cause of the challenged employment action." *Nassar*, 133 S. Ct. at 2528 (2013) (emphasis added).

Specifically in *Iqbal*, the general pleading of discriminatory intent was conclusory and "respondent's complaint d[id] not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind." *Iqbal*, 556 U.S. at 683. Similarly, in a "but-for" employment discrimination claim, mere conclusory allegations are insufficient; the complaint must contain facts that plausibly suggest the employer's discriminatory state of mind necessary for "but-for" causation. See *Twombly*, 550 U.S. at 557-58 (quotes omitted)("we explained that something beyond the mere

possibility of loss causation must be alleged, lest a plaintiff
with a largely groundless claim be allowed to take up the time of
a number of other people, with the right to do so representing an
*in terrorem* increment of the settlement value"). For example, a
complaint alleging an ADEA violation cannot contain factual
allegations sufficient to plausibly suggest "that age is a motive
for the employer's adverse conduct and simultaneously claim that
there was any other proscribed motive involved." *Culver v.
Birmingham Bd. of Educ.*, 646 F. Supp. 2d 1270, 1271-72 (N.D. Ala.
2009).

This gatekeeper function of Rule 8(a) per *Iqbal* and *Twombly*
practically ensures that deficient claims are "exposed at the point
of minimum expenditure of time and money by the parties and the
court." *Twombly*, 550 U.S. at 557-58 (quoting 5 Wright & Miller §
1216, at 233-234). While "Rule 8 marks a notable and generous
departure from the hyper-technical, code-pleading regime of a prior
era, [] it does not unlock the doors of discovery for a plaintiff
armed with nothing more than conclusions." *Iqbal*, 556 U.S. at
678-79 (2009).

Rather than waiting until summary judgment whence discovery
has been already fully conducted, Rule 8(a) stands as an efficient
and practical gatekeeper at the motion to dismiss stage. As the
Supreme Court explained in *Twombly*:

> It is no answer to say that a claim just shy of a plausible
> entitlement to relief can, if groundless, be weeded out early

17

> in the discovery process through careful case management . . . given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, e.g., Easterbrook, *Discovery as Abuse*, 69 B.U.L.REV. 635, 638 (1989) ("Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by careful scrutiny of evidence at the summary judgment stage, much less lucid instructions to juries; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a § 1 claim.

*Twombly*, 550 U.S. at 559-60 (quotes omitted).  Just as in *Iqbal* where Rule 8(a) insulated high-ranking government officials responding to national security emergencies from "the burdens of discovery on the basis of a [nonspecific] complaint" *Iqbal*, 556 U.S. at 670, so too in employment discrimination cases does Rule 8(a) insulate employers from the burdens of discovery where "but-for" causation is lacking. See *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("[w]e do not sit as a "super-personnel department," and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive").

Finally, while a party may plead alternative or inconsistent claims or defenses under the federal rules, Fed. R. Civ. Proc. 8(d), alternative pleading does **not** relieve a plaintiff of its

obligation under Rule 8(a) to state "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 547. Contrary to alternative or inconsistent claims or defenses, "factual assertions in pleadings are judicial admissions conclusively binding on the party that made them." *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987) (quotes omitted). In the employment discrimination context, pleading facts sufficient for plausible "but-for" causation is incompatible with the facts necessary for other alternative theories requiring "but-for" causation. See Brian S. Clarke, *Grossly Restricted Pleading: Twombly/iqbal, Gross, and Cannibalistic Facts in Compound Employment Discrimination Claims*, 2010 UTAH L. REV. 1101, 1141 (2010). In an analogous situation, the Supreme Court rejected using Rule 8 alternative pleading to allow inconsistent facts stating that "an ADA plaintiff **cannot** simply ignore the apparent contradiction that arises out of the earlier [Social Security Disability Insurance] total disability claim [but] [r]ather, she must proffer a sufficient explanation." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (emphasis added).[4] Alternative pleading does not permit a plaintiff to make factual

---

[4] Specifically, a Social Security Disability Insurance claim requires a plaintiff assert "total disability" whereas an ADA claim requires the essential element that a plaintiff "is a qualified individual with a disability . . . who, with or without reasonable accommodation, can perform the essential functions of her job." *Cleveland*, 526 U.S. at 806.

contradictions that conflict with legal conclusions on essential elements of the claim; instead a "court should require an explanation of any apparent inconsistency with the necessary elements of [the] claim." *Cleveland*, 526 U.S. at 807.

If plaintiffs like Thomas were allowed to continue inclusion of claims similar to Counts II, III, and IV in their complaint, it would unlock the doors of discovery on these claims armed with nothing more than irreconcilable conclusions. Resolving these irreconcilable claims on summary judgment, rather than a motion to dismiss, wastes the time and money of the parties and the court. A review of the discovery materials attached to the parties' summary judgment briefing demonstrates the futility of allowing multiple "but-for" employment discrimination claims beyond the motion to dismiss stage. (Doc. 22-1; Doc. 22-2; Doc. 22-4; Doc. 27-1; Doc. 27-2; Doc. 27-3). Additionally, Thomas fails to explain how alternative pleading alleviates the factual inconsistencies of his complaint.[5] "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n. 17 (1983)).

---

[5] Similar to the approach in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), this court entered a show cause order on May 12, 2015 (Doc. 16) ordering Thomas to explain why it should not dismiss his multiple "but-for" claims.

**CONCLUSION**

For the reasons stated above, this court by separate order will deny Kamtek's motion for summary judgment on Count I and grant the motion on Counts II, III, and IV.

DONE this 28th day of October, 2015.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE